# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| BRUCE F. BRADLEY and SHARON B. BRADLEY, <br><br> Plaintiffs <br><br> v. <br><br> JEFFREY KRYVICKY, <br><br> Defendant | Civil No. 07-109-B-S |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case arises out of the sale of a personal residence in Seal Harbor, Maine. After the sale was completed, the windows in the home leaked and Plaintiffs Bruce and Sharon Bradley brought this action for fraud (Count I), negligent misrepresentation (Count II), breach of contract (Count III), and promissory estoppel (Count IV) against the seller Jeffrey Kryvicky. (Amended Complaint (Docket # 22.)) Now before the Court is Defendant's Motion for Summary Judgment on all counts. (Docket # 32.) After a thorough review of the parties' arguments, affidavits, depositions, and other exhibits submitted on the Motion, the Court concludes that there are issues of material fact that prevent the entry of summary judgment on the tort claims, but that summary judgment will be granted on the breach of contract and promissory estoppels claims.

## I. Summary Judgment Standard

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c); <u>Santoni v. Potter</u>, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  <u>Santoni</u>, 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  <u>Triangle Trading Co. v. Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  <u>In re Spigel</u>, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## II.  Facts

Jeffrey Kryvicky purchased the land that the subject residence sits on in 1980 and sometime between 1987 and 1988, he began construction of the residence located at 22 Upland

Road, Seal Harbor, Maine (hereinafter the "residence").[1] (Kryvicky Dep. at 21, 35.)   Defendant employed an architect, Steve Bucari, to provide assistance in the design and construction of the residence.  (Kryvicky Dep. at 23.)  The general contractor on the construction project was Nelson Goodwin.  (Kryvicky Dep. at 24.)  Defendant was very involved in the original construction of the house, and Mr. Goodwin believed that Mr. Kryvicky had an understanding of construction and construction materials.  (Goodwin Dep. at 34.)  After the residence was built, Defendant continued to use Mr. Goodwin to do maintenance on the house up until sometime after the year 2000, possibly as late as 2003 or 2004.[2]  (Kryvicky Dep. at 55.)

Starting in 1990 or 1991, Defendant and his family members usually lived at the Seal Harbor residence during the summer months.  (Kryvicky Dep. at 36-37.)  The windows installed in the residence are an unusual type for residential construction because there is no sash – the windows are fixed glass.  (Goodwin Dep. at 27-28.)  Mr. Goodwin, who installed the windows, stated that the windows "have been a disaster from the beginning."  (Goodwin Dep. at 2.)  During the construction of the house and specifying the windows, Pella Corporation, the window manufacturer," kicked the [window] order back saying the windows exceeded their design specifications" because there were too many square inches and they were too big.  (Goodwin

---

[1] Prior to owning the subject residence in Maine, Defendant had never owned a home on the water.  (Kryvicky Dep. at 160.)

[2] Mr. Kryvicky employed Joe Burch as a caretaker for a period of about 10 years beginning in about 1990 to watch over the house while he was away from the house.  (Kryvicky Dep. at 39.)  Mr. Burch did not have a regular reporting requirement as part of his duties, but he would contact the Defendant by telephone if there was something wrong with the house.  (Kryvicky Dep. at 40.)  After Mr. Burch stopped being the caretaker for the Defendant, Defendant hired Chris Wilson to be his caretaker and kept him as a caretaker until Defendant sold the house to Plaintiffs.  (Kryvicky Dep. at 45-46.)  Mr. Wilson reported to Defendant from time to time.  Usually when Defendant came up in the summer Mr. Wilson and Defendant would have a meeting and Mr. Wilson would tell Defendant what Mr. Wilson did during the preceding season.  (Kryvicky Dep. at 46-47.)  Typically, Mr. Wilson would not call Defendant if there had been leaks in the windows unless it was very severe.  Instead, Mr. Wilson himself would all the person responsible for fixing problems with the house.  For example, if the window was a problem, he would call Nelson Goodwin.  (Kryvicky Dep. at 47.)

Dep. at 30; Modeen Dep. at 12-13.)  Pella also indicated that the large casement windows were also too big because they would be too heavy and they would sag over time and they were not going to manufacture the windows.  (Goodwin Dep. at 30.)  Both Defendant and his architect wanted to maintain the window design and went back and forth with Pella.  Ultimately, Pella agreed that they would make the windows.  (Goodwin Dep. at 6, 30, 32.)

The windows leaked within two to three years of completion of the residence.[3] (Goodwin Dep. at 5, 34; Goodwin Dep. Exhibit 2.)  Depending upon where the storm came from it was possible to get a leak in almost any window in the house.  (Kryvicky Dep. at 100.)  Some of the windows leaked every time there was a Northeast wind or a driving rain from the Northeast.  (Goodwin Dep. at 34.)  On occasion Mr. Goodwin would deal with Pella directly on behalf of Defendant, and it was his practice when he was doing so to keep Defendant informed as to what he was doing because Defendant was interested in knowing what was going on with the house and in particular, the windows.  (Goodwin Dep. 40.)  In 1997, during the period of time when Pella came back and evaluated the residence's windows, Mr. Goodwin was involved in redoing and replacing certain of the windows in the home, some of the larger 64" x 96" windows were taken out and replaced with 64" x 64" windows and adding two 32" x 32" windows to occupy the same space.  In addition, many windows were professionally re-glazed. (Goodwin Dep. at 35-36; Goodwin Dep. Exhibits 3 and 4.)  Defendant received bills from Mr. Goodwin for leaking windows, and even received such bills after Pella supplied the windows and windows were redone in 1997 and 1998.  (Kryvicky Dep. at 112.)

---

[3] Defendant recalled that the house began having problems with windows leaking approximately five years after the residence was completed.  (Kryvicky Dep. at 59-60.)

4

After the repair and replacement of the windows in 1997 and 1998, the windows continued to leak.  (Goodwin Dep. Exhibit 5-6.)   Subsequent to the repair and replacement of the windows and the continued leaking of the windows, another representative from Pella came out to the residence to try to determine the cause of the continuing leaking problems. (Goodwin Dep. at 41-42.)  The newer windows installed in 1997 and 1998 were failing in the same way as the original windows, that is, the exterior glazing failed, which allowed water penetration, freezing, and finally displacement of the aluminum frame.  (Goodwin Dep. at 42; Goodwin Dep. Exhibit 8.)  At some point after 1999, Mr. Goodwin told Defendant that he did not believe he would ever be able to get the windows to stop leaking and that they were the wrong windows for that particular house.  (Goodwin Dep. at 45.)

Between November 1990 through March 1998, Mr. Goodwin and his employees spent a total of 126 hours dealing with window leaks.  (Goodwin Dep. at 43; Goodwin Dep. Exhibit 9 at 1.)  After replacing some of the window units beginning in May 1998, Mr. Goodwin indicated that installing the replacement units, removing and replacing siding as necessary, and removing and replacing interior trim required 338 additional hours of work.  (Goodwin Dep. Exhibit 9 at 1.)  From March 1999 through August of 2001 Mr. Goodwin and his crew spent an additional 151 man hours on the windows in the residence.  (Goodwin Dep. Exhibit 9.)

In August 2004, Defendant contacted Mia Thompson Brown, an owner and real estate broker with the Knowles Company, to list the residence for sale. (Brown Dep. at 5, 13; Kubetz Aff. Ex. J.)   On September 1, 2004, Defendant completed and executed a Seller's Property Disclosure.  (Kryvicky Dep. at 61; Kubetz Aff. Ex. C.; Kryvicky Dep. at 105; Bradley Dep. Exhibit 1.)   The Disclosure disclosed under Section V – General Information – regarding "KNOWN MATERIAL DEFECTS" that "in severe storms there are window leaks [sic] which

5

are random depending on direction of storms.  Must maintain which is common on ocean exposed homes." (Bradley Dep. Exhibit 1.)  After the residence had been on the market for approximately nine months, Defendant sought to have certain windows repaired, and hired Fine Line Builders of Bar Harbor to do the work.  (Kryvicky Dep. at 75-76; Modeen Dep. at 18-20, 21-23.)  At that time, Defendant had experienced some leaking in the fixed glass windows of the residence and some floor damage in a bedroom as a result of the leaks.  (Kryvicky Dep. at 76-78, 98-99; Modeen Dep. at 24-25.)  Defendant instructed Michael Modeen, the owner of Fine Line, to fix any leaking windows and any rot found in their vicinity, regardless of the cost. [4]  (Modeen Dep. at 27-28, 38.)  Mr. Modeen observed evidence that the windows had been leaking and noted that the oak trim material around the windows had turned black, which happens when oak gets wet.  (Modeen Dep. at 26.)

Mr. Kryvicky contacted Pella again to discuss the problem of the fixed glass windows leaking and to get information from Pella regarding how to stop the ongoing problem.  (Kryvicky Dep. at 94-95.)  Mr. Kryvicky specifically told the Pella representative that he wanted them to give direction to Mr. Modeen as to how to fix the leaky windows, and it was Defendant's understanding that Pella representatives gave that direction to Mr. Modeen.  (Kryvicky Dep. at 92.)  Mr. Kryvicky received a copy of a letter from Chuck Kaskiewicz of Pella Windows dated July 5, 2005, which he in turn gave to Mr. Modeen.  (Kryvicky Dep. at 161; Kryvicky Dep. Exhibit 24.)  This letter indicates that after inspecting the subject property, Pella's representative concluded that "over time the wind flexes the glass, which causes the sealant to become loose, and break down, therefore allowing the wind to drive water around the glass, which is setting in

---

[4] Mr. Modeen first worked on the residence during its construction while he was employed by Mr. Goodwin. (Modeen Dep. at 9.)  During the period of 2000 to 2005, Mr. Modeen did not have any involvement in the house. (Kryvicky Dep. at 56; Modeen Dep. at 18.)

the window frame."  (Kryvicky Dep. Exhibit 24.)  The letter then goes on to recommend the procedure for removing and reglazing the windows using a specific caulking and sealants. (Kryvicky Dep. Exhibit 24.)

Pella gave Mr. Modeen the specifications of how to go about his work on the windows, and Mr. Modeen understood that it was Defendant's objective to fix the windows so that they would not leak.  (Modeen Dep. at 29.)  Typically, when Mr. Modeen buys and installs windows on his jobs for people, he guarantees against leaks arising from installation of new windows. (Modeen Dep. at 39.)  However, in this case, Mr. Modeen indicated to Defendant that he was not going to guaranty the work on the windows, Defendant did not express that this was a problem.[5] (Modeen Dep. at 39-40.)

Defendant indicated to his real estate broker, Mia Thompson Brown, that he was planning to change out some of the windows in the subject property and was going to have that work done prior to the sale.  (Brown Dep. at 28.)  Ms. Brown understood that the Defendant was going to take the windows out and have them re-caulked and put back in order to try to stop the leaks.  (Brown Dep. at 29: 2-3; Kryvicky Dep. at 99.)  Ms. Brown understood that if people asked her about the windows in the subject property based on the seller's disclosure, she would tell them the Defendant was going to be replacing some of the windows.  (Brown Dep. at 30.) Ms. Brown had a meeting with Defendant on July 8, 2005 to clarify what windows in the homes had been fixed.  (Brown Dep. at 45.)

---

[5] Defendant denies that Mr. Modeen told him that the windows were not guaranteed at this point.  (Kryvicky Dep. at 103-104.)  There is a factual dispute as to when this lack of warranty was communicated to Mr. Kryvicky.  Mr. Modeen asserts that he told Defendant that he would carry out the work per Pella's specifications but without a warranty from the outset.

Sometime in July 2005, Plaintiffs contacted Keating Pepper, an owner and real estate broker with the Knowles Company, to help them find a seasonal residence to purchase on Mt. Desert Island.[6]   (Pepper Dep. at 5.)   Plaintiffs ultimately decided to focus on negotiating to purchase the Seal Harbor residence owned by Mr. Kryvicky.  (Bradley Dep. at 34-35.)  When Mr. Bradley looked at the house everything in the house looked very well taken care of and "the windows, … the way they were trimmed out … and the way the wood was varnished, everything looked very nice."  (Bradley Dep. at 61.)  However, the Bradleys felt that windows leaking was "not a routine situation," and instructed their broker that they "want[ed] to make sure that that issue was addressed and corrected" so they "would [not] get stuck with" leaky windows after the sale.  (Bradley Dep. at 64-65, 71-72.)  Mr. Pepper conveyed Mr. Bradley's concerns to Ms. Brown.  (Pepper Dep. at 15; Brown Dep. at 39-40.)  During the Bradleys' discussions about the window issue with their broker, Mr. Pepper indicated that Defendant said he was going to take care of the windows and things were already under way to deal with the issue.  (Bradley Dep. at 66.)

The negotiations concerning the purchase of the residence lasted from approximately August 8 to August 22, 2005. (Bradley Dep. at 36.)  One of the issues the parties negotiated was repairs to the windows.  Mr. Kryvicky recalls that before the purchase and sale agreement was executed, the Bradleys expressed concerns about the window issues and that there was "a discussion that I would finish the windows and do the re-glazing." (Kryvicky Dep. at 89.)  During the negotiation process, Mr. Bradley had a telephone conversation with Mr. Kryvicky

---

[6] Plaintiff Bruce Bradley is the principal owner of Castleton Holdings, a real estate investment and development company. (Bradley Dep. at 17-18.)  Plaintiff Sharon Bradley is the wife of Bruce Bradley.  Bruce Bradley has a background in property management, commercial brokerage, and commercial real estate development with only minor involvement in development of residential projects.  (Bradley Dep. at 11-13, 19-20.)

and which Mr. Pepper participated, where the windows issues were discussed.[7]  (Bradley Dep. at 58-59, 66-67.)  During that conversation Mr. Bradley and Mr. Pepper voiced their concern that whatever the issue was with the windows and the conditions of the windows, that they wanted that addressed and taken care of as part of the sale.  (Bradley Dep. at 59.)  During that same telephone conversation, Mr. Kryvicky indicated that this window issue "was already being handled, that he was already taking care of the matter [and] he was talking to the window manufacturer, Pella, as well as . . . having a structural engineer look at the issue."  (Bradley Dep. at 59.)  Mr. Kryvicky emphasized his professional background was an engineer, so that he was going to make sure everything was taken care of perfectly.  (Bradley Dep. at 59-60.)

Following numerous conversations between the parties' brokers regarding the window issue, the parties eventually drafted and adopted Addendum 3 as part of the purchase and sale contract.  (Kryvicky Dep. at 75, 88; Brown Dep. at 38, 42-43, 63-66; Brown Dep. Exhibit 19.) Mr. Kryvicky provided the language for  Addendum 3 and then Ms. Brown typed it and he signed it.  (Kryvicky Dep. at 74, 89, 120; Kryvicky Dep. Exhibit 2; Pepper Dep. at 51.) Addendum 3 specifically details the reglazing repair work that Mr. Kryvicky must complete on certain specified windows in the residence.[8]   (Kubetz Aff. Ex. B; Kryvicky Dep. at 74-75.) Addendum 3 was executed by the parties in connection with the Purchase and Sale Agreement. The parties agree that the purpose of re-glazing the windows as described in Addendum 3 was to stop the specific fixed glass windows from leaking.  (Bradley Dep. at 105; Kryvicky Dep. at 96.) Plaintiffs signed the Disclosure on August 22, 2005, indicating that they had "read and received

---

[7] Defendant denies conversation took place.  (Kryvicky Dep. 86-87.)

[8] Between the time Defendant put the house on the market in September 2004 and June of 2005, he had not gotten any offers on the subject property.  (Kryvicky Dep. at 80.)

a copy of this disclosure and understand that [they] should seek information from qualified professional if [they] ha[d] questions or concerns."  (Bradley Dep. at 94; Kubetz Aff. Ex. C.) The same day, Plaintiffs executed a Purchase and Sale Agreement for the residence.  (Bradley Dep. at 95-97; Kubetz Aff. Ex. A.)  Paragraph 19 of the Agreement is an integration clause, which states: "PRIOR STATEMENTS: Any representations, statements and agreements are not valid unless contained herein.  This Agreement completely expresses the obligations of the parties." (Kubetz Aff. Ex. A.)  Paragraph 26 of the Agreement, titled "OTHER CONDITIONS" specifically incorporates into the Agreement three addenda by reference.  (Id.)

Paragraph 13 of the Agreement provided Plaintiffs with the right to conduct a variety of inspections of the residence.  (Kubetz Aff. Ex. A.)  If Plaintiffs found the results of any of the permitted inspections to be unsatisfactory, Plaintiffs could cancel the Agreement.  (Id.)  Among the permitted inspections was a professional home inspection.  (Id.) Plaintiffs hired Dennis W. Curtis, a professional engineer employed by Criterium-Brown Engineers, to conduct a professional home inspection of the residence.  (Bradley Dep. at 110-111; Kubetz Aff. Ex. M.; Curtis Dep. at 6.)  Mr. Curtis conducted the inspection on August 29, 2005.[9]  (Curtis Dep. at 6-7.)  Mr. Bradley, Mr. Pepper and Ms. Brown accompanied Mr. Curtis while he conducted the home inspection.  (Bradley Dep. at 89; Curtis Dep. at 14.)  The condition of the windows came up during the course of the inspection.  Mr. Curtis was informed that he did not have to do an in-depth inspection of the windows, because "the windows were being handled by the seller, and … [that the seller] was dealing with Pella and sorting through" the issues with the windows.[10]

---

[9] The inspection lasted approximately four hours, which is typical for an inspection of that type.  (Curtis Dep. at 14.)

[10] During his inspection, and as reflected in his notes, Mr. Curtis recalls that he observed some pine trim, which was not in keeping with the remainder of the trim throughout the house on a window and he inquired of Mr. Pepper why that was, and Mr. Pepper indicated that that particular window had been replaced and the trim was temporary.  It

(Bradley Dep. at 89-90; Curtis Dep. at 16-17, 19-20.)  Mr. Bradley did not ask Mr. Curtis to inspect the windows specifically as part of his inspection to check and verify the status of the work referred to in Addendum 3 because some of the window work was still to be performed and the window work was ongoing.  (Bradley Dep. at 102-103.)  A final Home Inspection Report was completed on September 1, 2005.  (Curtis Dep. at 47; Kubetz Aff. Ex. N.)  Mr. Curtis reported that the windows "are generally in good operating order."  (Kubetz Aff. Ex. N, at 18.)

After the Purchase and Sale Agreement had been signed but before the parties closed on the sale of the residence, Mr. Bradley had a second conversation with Mr. Kryvicky, Mr. Pepper and Ms. Brown that occurred in the context of discussing items related to the home inspection.[11] (Bradley Dep. at 84-85.)  During this second telephone call, Defendant indicated that he was not satisfied with the work Fine Line did on one of the windows, "so he had them rip it out and do it again to make sure it was done right."  (Bradley Dep. at 85-86.)  At some point, Mr. Kryvicky indicated "I am re-bedding these windows, I will make them right [and] [t]hey won't leak when we're done"[12] to Mr. Bradley and Mr. Pepper.  (Pepper Dep. at 13-15.)  During this conversation at the residence, Mr. Kryvicky gave a very detailed "dissertation" on the windows and indicated that they were being wiped with a certain chemical and the bedding compound was being done and how they were going to test them when it was all said and done.  (Pepper Dep. at 20.)  Based on this conversation, Mr. Pepper believed that Defendant would be handling the supervision of

---

was his understanding that the trim was going to be replaced with something more in keeping with the rest of the house at a later time.  (Curtis Dep. at 18-19.)

[11] Defendant also denies conversation took place.  (Kryvicky Dep. 90-91.)

[12] Defendant also specifically denies making those statements as represented by Mr. Pepper.  (Kryvicky Dep., 134-137.)

the re-bedding of the windows and that the windows wouldn't leak when he was done.  (Pepper Dep. at 20.)

At some time in 2005, Pella tested the windows and indicated to Mr. Modeen that the windows still leaked.  (Modeen Dep. at 47.)  After the windows were water tested and continued to leak, Mr. Modeen and his crew did not go back to the site to do any more work.  (Modeen Dep. at 47.)  Mr. Modeen was never asked by Mr. Kryvicky to conduct any kind of testing on the windows to see if they still leaked after his work was done, and when he finished the job for Mr. Kryvicky, he did not know whether the repair worked.  (Modeen Dep. at 49.)

The parties closed on the sale of the Residence on October 20, 2005 with a final purchase price of $3,200,000.[13]  (Amended Complaint ¶ 5.)  Within ten days after closing, the windows again leaked during a severe rain event.  The leaking windows prompted Mr. Pepper to write a memorandum to Ms. Brown and Mr. Kryvicky.  (Brown Dep. at 90-91; Brown Dep. Exhibit 30; Bradley Dep. at 84, 113-115; Kubetz Aff. Ex. F; Pepper Dep. at 17-18.)  Thereafter, with the exception of the small fixed glass windows, most of the windows were leaking in the house in rain storms with any direct driving rain regardless of the severity of the storm.   As long as there is consistent rain hitting the windows, there is water penetration in the house.  (Bradley Dep. at 79-80.)  Out of the roughly 10 rooms, excluding bathrooms, in the home, seven out of the 10 rooms have leaking windows, and two out of the five bathrooms in the home have leaking windows.  (Bradley Dep. at 81-82.)

Mr. Bradley contacted Mr. Modeen to see if he would come remedy the continuing window leaking problems.  (Bradley Dep. at 118-119.)  Mr. Modeen went to the residence and

---

[13] Defendant was represented by Ms. Brown in the sale of the subject property and the Bradleys were represented by Mr. Pepper.  Both Mr. Pepper and Ms. Brown were with the Knowles Agency.  (Kryvicky Dep. at 75; Pepper Dep. at 2-3.)

attended a meeting with Mr. Pepper and Ms. Brown, and looked at the windows himself and confirmed that they were in fact still leaking, and some of the windows that were still leaking were some of the same windows Mr. Modeen had worked on in the summer of 2005.  (Modeen Dep. at 67-68.)  At that time, Mr. Modeen indicated that he was aware that the house had leaked for years, that he was part of the original crew that built the house, and that is why Mr. Modeen had informed Defendant that he was not willing to stand behind the work on the windows. (Bradley Dep. at 120.)  Mr. Modeen thought the only solution would be replacing the windows. (Bradley Dep. at 126.)  Mr. Modeen contacted Defendant and indicated that the Bradleys had contacted him to complain that the windows were still leaking.  (Kryvicky Dep. at 102-103.)  In discussing the Bradleys' complaint that the windows were still leaking, Mr. Modeen informed Defendant that he could not guarantee the work done on the windows.[14]  (Kryvicky Dep. at 103.)

## III. Discussion

### A.  Fraud Claim (Count I)

To find Defendant liable for fraud, Plaintiffs must prove by clear and convincing evidence that Defendant (1) made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard as to whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance upon it, and (5) that the Plaintiffs justifiably relied upon the representation as true and acted upon it to their detriment.  St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of NY, 818 A.2d 995, 1003 (Me. 2003) (citing Letellier v. Small, 400 A.2d 371, 376 (Me. 1979)).  The heightened standard of proof of clear and convincing evidence requires that the "[P]laintiffs bear the burden of persuasion to 'place in

---

[14] Defendant testified that this was the first time that Mr. Modeen had  indicated to him that there would be no guarantee for the work done on the windows by Fine Line Builders. (Kryvicky Dep. at 103-104.)

the ultimate factfinder an abiding conviction that the truth of [their] factual contentions are 'highly probable.'"" Id. (quoting Taylor v. Comm'r of Mental Health & Mental Retardation, 481 A.2d 139, 153 (Me. 1984) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984))).

Plaintiffs allege that Defendant made false statements about the windows propensity for leaking and fixing the windows leaking problem.  Among other statements, Plaintiff relies on by allegedly stating that the re-glazing process would resolve the problem of the leaking windows. Plaintiffs specifically allege that Defendant made false statements (1) in the Seller's Property Disclosure "by understating the scope and nature of the window leaking problem," and (2) by allegedly stating that the re-glazing process would resolve the problem of the leaking windows. Defendant responds that "there is no evidence in the record from which a factfinder could conclude that Defendant knowingly or recklessly made factual misrepresentations in connection with this transaction."  (Defendant's Motion for Summary Judgment at 5.)  Defendant also asserts that, even assuming that any such representations were made or information was furnished, Plaintiffs cannot prove that they justifiably relied upon that representation or information.[15]

Relying on Stevens v. Bouchard, 532 A.2d 1028 (Me. 1987), Defendant asserts that he had no duty to disclose defects in the residence prior to the sale absent a special relationship between buyer and seller. (Defendant's Motion for Summary Judgment at 6.)  In Stevens the court held that there is no general duty of disclosure on a homeowner to disclose known defects in a home, citing the general rule of caveat emptor.  See also Brae Asset Fund, L.P. v. Adam, 661

---

[15] Defendant has only argued that there are not sufficient facts upon which to find that a false statement was made or sufficient facts to find the Plaintiffs could have relied upon the representations.  Because Defendant does not challenge the sufficiency of the evidence on the other three elements of the fraud claim, the Court will likewise not address those elements.

A.2d 1137 (Me. 1995) (defendant's silence could not give rise to a fraud claim).  However, Stevens is clearly distinguishable from the facts of this case.  In Stevens, the seller did not disclose an allegedly known roof leak that had existed for several years in the home, and the court's opinion makes clear that the seller was silent as to this condition.  Stevens, 532 A.2d at 1029.  Here, however, Plaintiff asserts that Defendant went out of his way to make representations about the windows and that in doing so failed to tell Plaintiffs the truth.

It is a well-established principle of tort law that one who voluntarily elects to make a partial disclosure is deemed to have assumed a duty to tell the whole truth, i.e., to make full disclosure, even though the speaker was under no duty to make the partial disclosure in the first place.  See Restatement (Second) of Torts § 551(2)(b) (1976).[16]  The comments to section 551 recognize that there is a distinction between remaining silent and saying nothing about a defect, which is not actionable unless a special duty exists, and disclosing half truths or misleading ambiguous statements which another may rely upon to his detriment.  See Restatement (Second) of Torts § 551, cmt. c, g, h, i, m and illus. 9.  Maine law is in accord with section 551(2)(b) of the

---

[16] Section 551(2) Restatement (Second) of Torts entitled "Liability for Nondisclosure" provides:

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated

    (a)    matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

    (b)    matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

    (c)    subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

    (d)    the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

    (e)    facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement of Torts.  See Stevens, 532 A.2d at 1030 (claim for failure to inform purchaser of leaking roof is not actionable in the absence of a special relationship unless the complaint alleges affirmative statements or acts intended to deceive); Eaton v. Sontag, 387 A.2d 33, 38 (Me. 1978) ("[I]t is not fraud for one party to say nothing respecting any particular aspect of the subject property for sale where no confidential or fiduciary relationship exists and where no false statement or acts to mislead the other are made…").  See also V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 414-15 (1st Cir. 1985) (applying Massachusetts law and explaining "[a]lthough there may be no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge.  Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies.") (internal citations and quotations omitted).

       In this case, there is evidence in the record that, if believed, demonstrates that the windows started leaking within a few years after the house was built and continued to leak until the residence was sold and that Mr. Kryvicky knew of the leaking.  Specifically, Defendant paid for hundreds of hours to Mr. Goodwin and his crew for repairs to the windows up to and including the time that the windows were repaired and replaced by Mr. Goodwin's crew in 1997 and 1998.  In addition, Mr. Kryvicky had representatives from the manufacturer involved in trying to remedy the situation on multiple occasions, including having a major window renovation in 1997-98.  In the early 2000s, Defendant had ongoing leaks in the windows that necessitated replacing some flooring and caused wood rot around the windows.  Defendant took it upon himself to hire Fine Line Builders to do work on the windows in the summer of 2005

16

before Plaintiffs even raised the windows issue with Defendant.  There is also evidence in the record, when viewed in the light most favorable to Plaintiff, that after all of the time, effort, and money had been spent on the windows, Defendant knew, based on the structural design of the windows, that the repairs outlined in Addendum 3 would not remedy the problem.  Finally, there is also evidence that Plaintiffs specifically inquired about the window issue directly to Defendant and through the parties' agents, and that Defendant and his agents gave Plaintiffs assurances that the windows were being remedied.

With respect to the issue of justifiable reliance, Defendant asserts that given Plaintiffs' experience as a real estate purchaser, the professional home inspection by Mr. Curtis, the Seller's Property Disclosure which identifies a problem with the windows, and the agreement to do certain work as set forth in Addendum 3, Plaintiffs cannot establish that they justifiably relied upon any statements or information, provided or not provided by the Defendant.  (Defendant's Motion for Summary Judgment at 9.)  Clearly, under the terms of the Purchase and Sale Agreement, Plaintiffs had the right to inspect the residence, and if the inspection was not satisfactory to Plaintiffs, they had the right to cancel the Agreement.  Plaintiffs exercised this right and hired Mr. Curtis to conduct the inspection and prepare an inspection report.  However, because Defendant was still repairing the windows, the windows were not included as part of the inspection.  The issue of whether the Bradleys justifiably relied on Mr. Kryvicky's statements about the repairs on the windows is, on this record, inextricably intertwined with the disputed factual issues about what Mr. Kryvicky told Mr. Bradley and his agent about the ongoing window repairs.

On this evidentiary record, the issues of whether Defendant made false or misleading statements and whether Plaintiffs justifiably relied upon those statements are issues of fact that

17

cannot be determined on summary judgment.   The Court will, therefore, deny Defendant's Motion for Summary Judgment on Plaintiffs' fraud claim.

### B.  Negligent Misrepresentation

To find Defendant liable for negligent misrepresentation, Plaintiffs must prove that (1) there was a transaction in which Defendant had a pecuniary interest, (2) Defendant provided false information to Plaintiffs in connection with the transaction, (3) without exercising reasonable care or competence, and (4) Plaintiffs justifiably relied on that false information in that transaction.   Rand v. Bath Iron Works Corp., 832 A.2d 771, 774 (Me. 2003) (citing Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990)).

It is undisputed that Defendant was involved in a transaction with Plaintiffs in which he had a pecuniary interest, thereby satisfying the first element of negligent misrepresentation. However, like the fraud claim, Defendant asserts that he did not provide any false information to Plaintiffs and any reliance by Plaintiffs on the alleged assurances by Defendant, whether oral or written, was unreasonable as a matter of law.[17]   As with the fraud claim, the Court finds that the evidentiary record in this case presents material issues of fact that prevent summary judgment on the issues of Defendant's disclosure of false information and Plaintiffs' justifiable reliance on that information.  The Court will, therefore, deny Defendant's Motion for Summary Judgment on Plaintiffs' negligent misrepresentation claim.

### C.  Breach of Contract

To prevail on a breach of contract claim, Plaintiffs must prove the elements of a legally

---

[17] Here again, Defendant has only argued that there are not sufficient facts upon which to find that a false statement was made or sufficient facts to find the Plaintiffs could have relied upon the representations.  Because Defendant does not challenge the other element of the negligent misrepresentation claim – exercising reasonable care or competence, the Court does not address that element.

enforceable contract consisting of (1) a meeting of the minds; (2) consideration; and (3) mutuality of obligations.  See Dom J. Moreau & Son, Inc. v. Fed. Pac. Elec. Co., 378 A.2d 151,153 (Me. 1977).   In their Amended Complaint, Plaintiffs allege "[t]hat Defendant orally promised to the Plaintiffs that the Defendant would repair and resolve the problems with the leaking windows at the [residence]."    Amended Complaint ¶ 21.   Plaintiffs claim that they demonstrated their acceptance of this alleged oral promise by proceeding to close on the sale of the residence.   Defendant responds that the parties had a clear, unambiguous and fully integrated written Purchase and Sale contract that encompasses the same terms and conditions that Plaintiffs claim is the subject of the alleged oral promise.

The August 22, 2005, Purchase and Sale Agreement contains an integration clause, which provides that, "[a]ny representations, statements and agreements are not valid unless contained herein.  This Agreement completely expresses the obligations of the parties."  (Kubetz Aff. Ex. A ¶ 19.  Expressly referenced in the Purchase and Sale Agreement under the heading "Other Conditions" are Addenda 1 through 3.  (Id. ¶ 26.)  Specifically, the terms of Addendum 3 are:

> The Seller will complete the re-glazing of all fixed glass in the Living Room Bay and all large fixed glass on the lower level facing the ocean, which is the southeast exposure, and all large fixed glass on the northern exposure.
>
> On the upper level, the re-glazing of all fixed glass facing the ocean, which is the southeast exposure, and north exposure has been completed.
>
> Please note there is no fixed glass on the east exposure and no large fixed glass on the northwest exposure.
>
> Seller will be on site while the work is being completed on the lower level.

It is undisputed that Defendant complied with all of the requirements of Addendum 3, and that

the specified windows were re-glazed prior to closing.    Beyond the three Addenda, no modifications to the Agreement were made by the parties.

A contract is to be interpreted to effect the parties' intentions as reflected in the written instrument, construed with respect to the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished.    Handy Boat Service, Inc. v. Prof'l Servs., Inc., 711 A.2d 1306, 1308 (Me. 1998).  When an agreement is reduced to writing, as it was here, extrinsic evidence may be considered only in limited circumstances.  Rogers v. Jackson, 804 A.2d 379, 383 (Me. 2002).  The interpretation of an unambiguous contract is a question of law.   Id.; Handy Boat Service, 711 A.2d at 1308.  Because the above referenced contractual language is complete and unambiguous, alleged oral representations made prior to the execution of the contract are rendered inadmissible by the parol evidence rule.  Rogers, 804 A.2d at 381 ("The parol evidence rule operates to exclude from judicial consideration extrinsic evidence offered to alter or vary unambiguous contractual language.").   In short, the plain language of the Agreement and all documents referenced therein reflect the entire agreement between the parties.

Plaintiffs next assert that even if the parol evidence rule or the integration clause apply, "the statements contained within the parties' purchase and sale agreement and Addendum 3 are misleading and actionable." (Plaintiffs' Objection at 17.)  The Court notes that Plaintiffs' Amended Complaint does not assert a claim for breach of either of the written agreements. Clearly, Count III is based only on the breach of an alleged oral contract.  To the extent that Plaintiffs now seek to assert a claim based on the breach of the written agreements arguing the Purchase and Sale Agreement or Addendum 3 are "misleading and actionable," Plaintiffs' argument is without merit.   This argument cannot, in the Court's view, avoid the application of the parol evidence rule and the integration clause.

20

The Court concludes that the terms of the Purchase and Sale Agreement and Addendum 3, are clear and unambiguous.  The Purchase and Sale Agreement fully expresses the terms of the agreement between the parties, including the repairs that were to be undertaken regarding the windows.  Therefore, this Court finds that any statements, representations or promises made prior to August 22, 2005, may not be considered in interpreting the agreement between the parties, and Defendant is entitled to summary judgment on Plaintiffs' breach of contract claim.

### D.  Promissory Estoppel

Plaintiffs' promissory estoppel claim is similarly based on Defendant's oral "promise[] to the Plaintiffs that the Defendant would repair and resolve the problems with the leaking windows at the [residence]."  (Amended Complaint ¶ 27.)  Maine has adopted the Restatement formulation of the doctrine of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Bracale v. Gibbs, 914 A.2d 1112, 1115 (Me. 2007); see also Chapman v. Bomann, 381 A.2d 1123, 1127 (Me. 1978) (expressly adopting the theory of promissory estoppel as defined by Restatement 2d Contracts § 90)).  "Promissory estoppel applies to promises that are 'otherwise unenforceable.'"  Daigle Comm'l Grp. v. St. Laurent, 734 A.2d 667, 672 (Me. 1999).  In this case, the Purchase and Sale Agreement contains an integration clause.  The purpose of the integration clause, stating that no other agreements exist, is to prevent the parties from relying on statements or representations made during negotiations that were not included in the final written agreement.  To permit Plaintiffs to use an estoppel theory in order to add terms to a completely integrated contract would defeat the purpose of the integration clause.

Moreover, the doctrine of estoppel cannot be used as to circumvent the parol evidence rule.  As the alleged oral promise to fix the leaking windows is not a collateral agreement and therefore is barred by the parol evidence rule, it is unnecessary to address Plaintiffs' argument that Mr. Kryvicky's promise is enforceable under a promissory estoppel theory.  Although Maine law has not specifically addressed this issue, many other jurisdictions have held that a prior inconsistent oral promise cannot be the basis of a promissory estoppel claim.  See All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 869-70 (7th Cir. 1999); Hartford Fire Ins. Co. v. Nance, 12 F.2d 575, 576-77 (6th Cir. 1926); Durkee v. Goodyear Tire & Rubber Co., 676 F. Supp. 189, 192 (W.D. Wis. 1987) ( "To entertain a theory of recovery that makes a prior, inconsistent promise enforceable is to write the [parol evidence] rule out of existence."); Prentice v. UDC Advisory Services, Inc., 648 N.E.2d 146, 152-53 (1995); Davis v. University of Montevallo, 638 So.2d 754, 758 (Ala. 1994); Big G Corp. v. Henry, 536 A.2d 559, 562 (Vt. 1987).

The Seventh Circuit case, All-Tech Telecom, provides a sound explanation of this rule. The Court in All-Tech Telecom found the doctrine of promissory estoppel inapplicable to a series of oral promises made during the course of negotiations and during the course of the performance of a written agreement.  All-Tech Telecom, 174 F.3d at 869-70.  The Seventh Circuit affirmed the dismissal of the promissory estoppel claim holding that a "promisee cannot be permitted to use the doctrine to do an end run ... around the parol evidence rule."  Id. at 869. The court reasoned that where a written contract governs the relationship between the parties, promissory estoppel is a duplicative remedy:

> Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of

22

which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill. To allow it to be invoked becomes in those circumstances gratuitous duplication or, worse, circumvention of carefully designed rules of contract law.

Id. (citations omitted).

Promissory estoppel is unavailable in this case where an enforceable contract governs the same topic as the alleged oral promise. Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiffs' promissory estoppel claim.

### IV. Conclusion

Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment be, and it is hereby, GRANTED on Plaintiffs' claims for breach of contract (Count III) and promissory estoppel (Count IV) and DENIED on Plaintiffs' claims for fraud (Count I) and negligent misrepresentation (Count II).

/s/ George Z. Singal_____
Chief United States District Judge

Dated this 29th day of August, 2008.

23